WALLACE, JUDGE:
This claim was brought by Elizabeth Ann Hedges as Executrix of the Estate of A. Bruce Hedges, deceased, fpr compensation claimed due the decedent on a repáíf.job at. Fairmant State Gólíeíge,' Fairmont, West Virginia. The claimant’s decedént was a pláStering contractor who over a period of time had done certain work for the college.
*157 On or about April 19, 1973, the ceiling in the building of the college that housed the swimming pool fell, the plaster falling into the pool. A. Bruce Hedges and Robert E. Schmidt of L. D. Schmidt & Son, Architects, were called to the school to discuss with the officials repairs to be made to the ceiling.
The testimony shows that it was determined between the then college president, Dr. E. K. Feaster and Dean Yost, Dean of Administrative Affairs, that in order to have the pool ready for use for the next term of school the repair work should be done on an emergency basis rather than follow normal bidding procedures.
Mr. Robert E. Schmidt, the architect, testified that there were three different proposals discussed, “one was for lathe, one was for just painting the structural system, and the final one that was agreed upon was the elimination of the glue qh the ceiling and installing a plaster coat oyer a weld-crete coal. ■
Mr. Hedges, by his letter of May 10, 1973, addressed to Dr. Feaster, President of the College, agreed to do the work. His letter states that it was a preliminary estimate of approximately $4,000.00. As a result of the letter, the State Purchasing Director issued an emergency work authorization directed to Mr. Hedges, which authorization stated the cost shall not exceed $4,000,00. During the course of the work, Mr. Hedges was paid $4,000.00 and upon completion of the job he billed the college for an additional $8,756.00.
Harold B. Lawson, Director of Physical Facilities at Fairmont State College, testified that the decedent did most of the plastering repair work at the college for a number of years; that he understood the organizational structure very intimately, and that he was the architect’s prime contractor to do the job.
Lawson further testified that the decedent installed the ceiling which fell and for that reason did not intend to take the normal contractor’s profit. He stated that Hedges operated under-'very difficult conditions and that the school had an obligation id pay him the difference.
Lawson stated that “it was a very honorable job done” and that he believed Hedges incurred the costs in the performance of the job; that his bill was valid and was within the acceptable allowances for a job of that nature. The total cost figure compared with the number of square feet was allowable and acceptable for *158 the trade. Mr. Lawson, by letter to Homer Cox, the business manager of the college, recommended payment to the decedent.
Robert E. Schmidt, the architect employed by the college, testified that the college was extremely anxious to get the job done and that Hedges intended to do the job at his cost when he learned the wire system on the prior job was inadequate.
Schmidt further testified that the decedent did a good job and his bill was very reasonable and within the realm of industry standards.
The testimony developed that Mr. James Blackwood an-architect with L. D. Schmidt & Son, approved the payment ot the decedent’s bill. On cross examination, Mr. Schmidt was asked why his organization approved the bill for payment. Schmidt testified that his company was representing the school and all bills had to be approved. He testified that they knew Hedges did more work than was anticipated requiring more labor and more time. In a meeting with Schmidt, Dean Yost and Dr. Feaster, Hedges advised that his bid was too low and he could not complete the job. The school officials insisted that he finish the job and they would find a way to pay him out of repairs and alterations money. As a result, the architects as the owner’s agent, approved the bill for payment. Schmidt stated that the school officials felt they did not have time to get a change order for the job.
The administration of the college changed and the new officials knowing nothing of the situation apparently took the position that they had no legal basis for the payment of the cost over-run. None of the college officials testified except Mr. Lawson. The only witness for the respondent was Ben E. Rubrecht, the Director of Purchasing for the State of West Virginia; who knew only of'the $4,000.00 purchase order which was paid. He- testified {hat his investigation revealed that there was no request for an additional payment.
However, it was the school officials that determined the work should be done on an emergency basis. It was the school officials that, when learning of the cost over-run, represented to the decedent that he would be paid. The close relationship between the decedent and Fairmont State College established over the years was such that the decedent acted on those representations and completed the job expecting to be paid by the college.
*159 Nowhere in the testimony is there any evidence that the job was not done properly, but on the contrary, the testimony reveals the decedent was well respected in his trade and always did a good acceptable job as was done in the instant case.
The law provides for awards of claims which in equity and good conscience the State should pay. This is such a claim. There is no question that the work was well done and the costs incurred werg reasonable. The State received the benefit,of thg work dons ahd to deny recovery would be unjust enrichment to the State.
Accordingly, the Court is of the opinion that the claimant has established an equitable and just claim and awards the claimant the sum of $8,756.00.
Award of $8,756.00.